IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| FFP Holdings, LLC, | Case No. 3:14 CV 693 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | |
| Charles L. Moeller, et al., | JUDGE JACK ZOUHARY |
| Defendants. | |

Pending before this Court are: Defendant Charles "Lewie" Moeller's ("Lewie Moeller") Motion to Dismiss the Amended Complaint (Docs. 29 & 33); Defendants Daven Stedke ("Stedke") and Hume Supply, Inc.'s ("Hume") Motion to Dismiss the Amended Complaint (Docs. 30 & 33); and Stedke and Hume's (Doc. 31) and Plaintiff FFP Holdings, LLC's ("FFP") (Doc. 33 at 9–10) Cross-Motions for Sanctions.

BACKGROUND

**FFP's Organizational Structure**

Prior to March 2014, FFP, a Spencerville, Ohio limited liability company, was a large manufacturer of polyurethane foam (Doc. 22 at ¶¶ 2, 25). FFP's sole member is Ohio Decorative Products, LLC ("ODP"), whose sole member, in turn, is the Moeller Family Limited Partnership, LLP ("MFLP") (¶¶ 3–5). MFLP's partners serve as members of the Board of Directors for ODP and its subsidiaries ("the Board") (¶ 10). Hume Supply performed general contracting services on FFP projects from 2010 through 2012 (¶ 7). Stedke is the sole shareholder of Hume Supply (¶ 6).

**Lewie Moeller's Ouster**

Chuck Moeller, who founded FFP in the early 1970's and served as the firm's Chief Executive Officer ("CEO") (¶ 25), allocated MFLP's partnership shares to his son, Lewie Moeller, and four daughters. "[F]or a significant period prior to October 2005," Lewie Moeller also served as FFP and ODP's President, reporting to Chuck Moeller (¶ 28). Chuck Moeller hoped Lewie Moeller would succeed him to take "charge of [FFP's] daily operations" (¶ 27).

But in October 2005, "Lewie Moeller was forced to exit his position as President and Director" of the ODP family of companies, including FFP, because he was abusing drugs and alcohol and engaging in "self-dealing in violation of his fiduciary duties to ODP, FFP, the Board[,]" and MFLP's partners (¶¶ 29–30). In September 2006, Lewie Moeller's ownership interest in MFLP was redeemed. He has not since held ownership interest in "any unit[] of MFLP" (¶ 30). However, Lewie Moeller did briefly become President and CEO of ODP and its subsidiaries in 2012 (albeit without any renewed ownership interest) (¶¶ 5, 30).

**The "Shadow Consultancy"**

In early 2010, with knowledge "that the Board would not willingly accept Lewie Moeller back in any capacity in the business of use of FFP's assets to pay Lewie Moeller[,]" (¶ 34), Chuck Moeller, Lewie Moeller, Stedke, and Hume Supply "devised a scheme . . . to defraud FFP, its Board, and its shareholders of money and property" (¶¶ 33–34). By oral agreement, and while still FFP's CEO, Chuck Moeller created a "fake consulting agreement" between FFP and Hume Supply (¶¶ 14, 35). Hume Supply performed no services for FFP as a consultant (¶ 14). Instead, Lewie Moeller became Hume Supply's "shadow consultant" to FFP. The parties to this arrangement never prepared a writing to confirm the FFP-Hume Supply-Lewie Moeller connection "in order to conceal this relationship and

2

scheme from the Board" (¶ 36).  Had the Board uncovered the arrangement, it "would have immediately terminated [the shadow consultancy] payments," which were not in FFP's interests (¶ 37).

Beginning in March 2010, Hume Supply would periodically bill FFP "AS PER AGREEMENT" for services which it did not perform.  FFP would then pay Hume Supply as invoiced.  Lewie Moeller would then invoice Hume Supply for services allegedly provided secretly to FFP.  Hume Supply would pay these invoices using money obtained from the invoices submitted to FFP under the same "AGREEMENT."  The chain of invoices were sent via the U.S. Postal Service ("USPS") (¶¶ 43–48, 50–55, 82–83).

Alternatively, Hume Supply would funnel "AS PER AGREEMENT" funds to Lewie Moeller on an in-kind basis: during the period of the shadow consultancy, Hume Supply proposed, and later performed, construction services for Lewie Moeller at the so-called State Route 81 ("SR 81") Building (¶¶ 38–41, 47).  Lewie Moeller personally owned the previously-unimproved SR 81 Building.  Hume Supply added "a new floor, kitchen/bar accommodations, a rest room, hook-up to sewer, new roof panels, insulation, and an improved area for storage for Lewie Moeller's" car collection (¶ 39).  Throughout, Hume Supply documented the costs incurred at the SR 81 Building, which totaled some $97,000 in 2010 (¶¶ 41–42, 47).

**The Terrell, Texas Construction Project**

Aside from any margins it might have earned on the SR 81 Building project, Hume Supply benefitted from the shadow consulting arrangement because Lewie Moeller "steered construction work to Hume Supply in his role as a 'shadow consultant' without the Board's knowledge or approval" (¶ 35).  In September 2010, fire damaged FFP's Terrell, Texas manufacturing plant (¶ 58).

3

Lewie Moeller, unbeknownst to the Board, "positioned Hume Supply . . . to be able to beat the legitimate bid from another contractor on the repair of the Terrell, Texas facility" and persuaded Chuck Moeller to accept the terms of the Hume Supply plant repair proposal (¶¶ 59–62).

Hume Supply, as general contractor, was responsible for obtaining building permits, and Stedke "assured FFP that he would keep the project on time and on budget and work would not be stopped or delayed because he did not secure the necessary permits at the beginning of the project" (¶¶ 64, 66).  However, he failed to obtain the permits before beginning construction in mid-December 2010 (¶ 65) and, roughly a month later, city building inspectors "ordered Stedke and Hume Supply to stop work on the project" (¶ 67).  City offcials eventually refused to issue Hume Supply the necessary permits, and ordered the firm to "tear down portions of the new building they had constructed without the City's approval" (¶ 71).

Hume Supply ceased work at the building site in February 2011.  By then, Hume Supply had obtained some $641,000 from FFP, including "advance payments for work that was never performed" (¶ 68).  Hume Supply and Stedke continued to invoice FFP for "contract" and "added expenses[,]" such as rent for unused apartments leased to Hume Supply employees after the work stoppage, and reimbursements for tools left behind at the shuttered construction site (¶ 69).

FFP initially objected to the "construction" and "added expense" invoices, but shadow consultant Lewie Moeller ensured all Hume Supply invoices were paid.  Lewie Moeller "knew at the time he recommended approval of these invoices that they were false and contained inflated costs and entries for work that was never performed" (¶ 70).  Hume Supply received roughly $1.185 million from FFP for its work in Terrell, Texas, a portion of which allegedly covered Hume Supply's costs at the SR 81 Building (¶¶ 72–73).  "The invoices issued by Stedke and the approvals for payment

4

given by Chuck Moeller," facilitated by Lewie Moeller, "were part of the agreement and scheme

between Lewie Moeller and Stedke to defraud FFP of money and property" (¶ 74).

**FFP's Claims**

Based on this conduct, FFP brings six claims against Defendants:

1.       A federal RICO claim, alleging as predicate acts mail and wire fraud (as against all Defendants) (¶¶ 75–87);

2.       An Ohio Corrupt Activities ("OCA") claim, alleging as predicate acts mail fraud, wire fraud, and felony theft (as against all Defendants) (¶¶ 88–98);

3.       An Ohio fraud claim (as against all Defendants) (¶¶ 99–103);

4.       An Ohio breach of contract claim (as against Hume Supply) (¶¶ 104–08);

5.       An Ohio unjust enrichment claim (as against Hume Supply and Stedke) (¶¶ 109-12); and

6.       An Ohio state-law claim, alleging Hume breached its duty to perform in a workmanlike manner on the Terrell, Texas project (as against Hume Supply) (¶¶ 113–17).

## STANDARD

Because the Amended Complaint contains allegations of fraud, Defendants' Motions to

Dismiss are governed by two Federal Civil Rules. Federal Civil Rule 8(a)(2) requires, among other

things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal

Civil Rule 9(b) requires that "[i]n alleging fraud . . . , a party must state with particularity the

circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's

mind may be alleged generally."

Under Federal Civil Rule 12(b)(6), this Court tests the legal sufficiency of a complaint, which

requires accepting all well-pleaded factual allegations as true and construing the complaint in the light

most favorable to plaintiffs. *See Duabay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). Although the

5

complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

### DISCUSSION

In separately moving to dismiss the Amended Complaint, Defendants raise similar arguments. Both argue the Amended Complaint fails to allege, with requisite particularity, predicate acts for either the federal RICO or OCA claim (or, more generally, fraud) (Doc. 29-1 at 8–13; Doc. 30 at 10–14). Both contend that Lewie Moeller and Stedke did not participate in or conduct FFP's affairs (Doc. 29-1 at 15-17; Doc. 30 at 14–15). Each Motion raises arguments unique to Lewie Moeller or Stedke. Striking out on his own, Lewie Moeller argues the Amended Complaint fails to allege a pattern of racketeering activity that is sufficiently continuous (Doc. 29-1 at 13–15) or an association-in-fact tying Defendants to FFP (*id.* at 15–16).[1]

---

[1]

Defendants also argue Ohio's business judgment rule bars FFP's claims (Doc. 29-1 at 4–8; Doc. 30 at 7–10). Because none of the Defendants were Board members during the period of the alleged scheme to defraud, they cannot invoke this rule found in R.C. § 1701.59(B) & (D). *See Radol v. Thomas*, 772 F.2d 244, 257 (6th Cir. 1985). Further, accepting the Amended Complaint's factual allegations as true, FFP's suit does not "second-guess" a business decision FFP knowingly made; instead, it seeks to recover company funds that were extracted by outsiders through deceptive and fraudulent means.

6

**FFP's RICO Theory**

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," 18 U.S.C. § 1962(c), or to conspire to engage in such a violation, *id*. §1962(d). "Racketeering activity" includes violations of the federal mail and wire fraud statutes. 18 U.S.C. § 1961(1) (listing 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) as predicate acts). "Any person injured in his business or property by reason of a violation of [S]ection 1962 . . . may sue therefore . . . ." 18 U.S.C. § 1964(c). "Congress chose self-consciously expansive language when it adopted RICO, defined the predicate acts necessary to establish a pattern of racketeering activity broadly, and directed courts to give the statute a liberal construction." *Jackson v. Sedgwick Claims Mngt. Serv., Inc.*, 731 F.3d 556, 563 (6th Cir. 2013) (en banc) (internal citations and quotation marks omitted). Thus, to allege a violation of Section 1962(c), FFP must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) (footnote omitted).

FFP's RICO claim is premised on violations of both Sections 1962(c) and (d), alleging that Lewie Moeller, Stedke, and Hume Supply conspired to be, or were in fact, "associated with" FFP, the "enterprise" (Doc. 22 at ¶¶ 78, 84–85). Using the USPS "for the purpose of executing their scheme to defraud FFP[,]" Lewie Moeller, Stedke, and Hume Supply "place[d] in the mail . . . for delivery false and fraudulent invoices for consulting services by Hume Supply that were never provided or purposely inflated to FFP" (¶ 82). Similarly, Lewie Moeller, Stedke, and Hume Supply intended to "use their false invoices and misrepresentations to induce FFP into mailing payments to Hume Supply

7

for delivery by [the USPS]" without the Board's knowledge (¶ 83). The Amended Complaint alleges at least five instances in which Defendants used the mails in this manner (¶¶ 44, 50–51).

Stedke and Hume Supply "associated with FFP as consultants and contractors," and "knowingly agree[d] with Lewie Moeller to facilitate the scheme to defraud FFP by serving as a fake consultant to FFP"; accepting payment from FFP for services never performed; and funneling the FFP funds to either the SR 81 Building or to Lewie Moeller "for consulting work he never performed." All the while, Stedke and Hume Supply concealed the arrangement from FFP by issuing false invoices (¶ 84). Lewie Moeller "knowingly facilitat[ed] the approval of the fake consulting arrangement" (¶ 85).

### "Racketeering Activity"

Because the RICO claim depends on predicate acts of mail and wire fraud, it must "adequately allege[] a scheme to defraud, the use of the mail or wires in furtherance of the scheme, and a sufficient factual basis from which to infer scienter." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012). *See also Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013) ("Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it."); *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003) (noting same standard applies to allegations of wire fraud). So far as the Amended Complaint alleges fraud, Federal Civil Rule 9(b) further requires FFP to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quotation marks omitted). *See also Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) ("To satisfy [Federal Civil Rule ]9(b), a plaintiff must at minimum allege the time, place[,] and contents of the misrepresentation(s) upon which he relied.").

8

Lewie Moeller argues FFP fails in this task because the Amended Complaint is only "repleat (*sic*) with general allegations" that Defendants "'devised a scheme' to 'defraud' FFP," but lacks "any factual allegations as to how that scheme took place, where or when the fraud occurred, what was stated to whom[,] or what did not occur" (Doc. 29-1 at 11).  Similarly, Stedke argues that "FFP does not allege, with any particularity, that either [the consulting or SR 81 Building-related invoices were] actually false; in fact, it says the invoices are true" (Doc. 30 at 12).  *See also id.* at 12–13 (arguing the Amended Complaint alleges with particularity only that Hume Supply billed FFP for services that Lewie Moeller actually performed).

The Amended Complaint adequately alleges a scheme to defraud FFP because it alleges Defendants "knowingly omit[ted] a material fact" from their communications with FFP.  *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).  Specifically, the Amended Complaint alleges the invoices were not actually paid to Hume Supply as an FFP consultant -- in fact, Hume Supply did no consulting work for FFP -- but instead paid to shadow consultant Lewie Moeller, who the Board had expelled from all participation in MFLP entities.  Defendants knew the Board would not accept Lewie Moeller back in any capacity, nor would it allow FFP assets to be diverted to Lewie Moeller.  Consequently, Defendants sought to conceal Lewie Moeller's role in the scheme by setting up Hume Supply as a middle man, and by not documenting the shadow consultancy's true nature (Doc. 22 at ¶¶ 14, 16, 36–37).

In addition to explaining why the statements are fraudulent, the Amended Complaint adequately alleges the "who, what, when, where" of the specific false statements, misrepresentations, or omissions that drove the scheme by extracting money from FFP.  The Amended Complaint sets forth the specific dates on which Hume Supply invoiced FFP in furtherance of the scheme, the specific invoice amount, invoice description, and the dates on which FFP paid the invoices (¶¶ 44, 50,

51).  The Amended Complaint provides similar information for the invoices Lewie Moeller submitted

to Hume Supply, including the date of each invoice and the amount it claimed (¶¶ 52, 84).  Thus, each

Defendant knows the specific role they are alleged to have played in the predicate acts.  *See DiVittorio*

*v. Equidyne Extractive Indus., Inc*., 822 F.2d 1242, 1247 (2d Cir. 1987).

       **"Enterprise"**

       Defendants further claim the Amended Complaint fails to adequately allege a RICO enterprise,

or that Defendants "conduct[ed] or participate[d] . . . in the conduct of" the alleged RICO enterprise.

Lewie Moeller notes that "FFP has plead itself as the enterprise" (Doc. 29-1 at 16 (citing Doc. 22 at

¶ 78)), and argues any attempt to create an association-in-fact between Moeller and FFP fails "because

there is no common purpose to engage in a course of conduct as between FFP and Lewie Moeller"

(Doc. 29-1 at 16).

       In response, FFP notes the victim of a RICO offense also can be the RICO enterprise, and that

in any event "FFP is also not the only possible enterprise under the federal and state racketeering

laws. . . . Given the close association of Stedke, Lewie Moeller, and Chuck Moeller, they too would

qualify as an association-in-fact enterprise" (Doc. 33 at 13–14).  This Court construes this second

assertion, referencing an association-in-fact enterprise that does not include FFP, as an amendment

by interlineation of the Amended Complaint's "enterprise" allegations.  *See Foman v. Davis*, 371 U.S.

178, 182 (1962). As such, this Court reads the Amended Complaint to allege an association-in-fact

RICO enterprise comprised of Defendants and Chuck Moeller.

       "[A]n association-in-fact enterprise must have at least three structural features: a purpose,

relationships among those associated with the enterprise, and longevity sufficient to permit these

associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  *See*

*also United States v. Turkette*, 452 U.S. 576, 583 (1981).  The requirements of an association-in-fact

10

"are interpreted flexibly.  For example, members do not need to hold fixed roles, and a chain of command is not required."  *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 967 (6th Cir. 2012), *overruled on other grounds by Jackson*, 731 F.3d at 566.  RICO's "enterprise" element requires more than just allegations of a pattern of racketeering activity; but allegations of structure, purpose, and longevity gain plausibility when viewed next to plausible allegations of a series of predicate acts.  *See United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006) ("[P]roof of a pattern of racketeering activity c[an] also be used to show the existence of an enterprise.").

The Amended Complaint adequately alleges a RICO enterprise.  Drawing inferences from well-pled allegations in FFP's favor, the "purpose" of the alleged RICO conspiracy is sufficiently clear: to extract assets from FFP.  Through the shadow consultancy, Lewie Moeller gained access to FFP assets, both in-gross (the shadow consulting fees funneled through Hume Supply) and in-kind (improvements at the SR 81 Building financed by FFP).  Hume Supply and Stedke gained work at the SR 81 Building -- after all, it is plausible to infer that Hume Supply and Stedke would not perform work at the site without margins of their own.  Hume Supply also gained access to a key decision-maker at FFP, Chuck Moeller, through shadow consultant Lewie Moeller.

The Amended Complaint also provides sufficient notice to Defendants of the "relationships among those associated with the" RICO enterprise.  Chuck Moeller, working on the inside, approved transfers of FFP assets to the members of the RICO enterprise.  Hume Supply and Stedke funneled those assets to Lewie Moeller (or, indirectly, to the SR 81 Building) through invoices submitted to FFP.  Lewie Moeller provided Chuck Moeller with consulting services that the Board would otherwise have barred.  He also was a key supporter for Hume Supply and Stedke, helping them land FFP work.      Finally, the Amended Complaint adequately alleges an association-in-fact enterprise that lasted long enough for the RICO enterprise to achieve its purpose: specifically, that the shadow

11

consultancy arrangement diverted some $250,000 over the course of five fraudulent mailings.

### "Conduct"

The Amended Complaint fails the Reeves "operation or management" test, Lewie Moeller continues, because he "had no official or unofficial position" with FFP at times relevant to the RICO claim (Doc. 29-1 at 17).  Similarly, Stedke argues the Amended Complaint contains no allegations that he or Hume Supply "'directed' FFP's affairs," but rather "FFP was Chuck Moeller's company" (Doc. 30 at 14–15).  These arguments miss the mark.

"Conduct" amounts to plausible allegations that each Defendant "participated in the 'operation or management' of the enterprise."  *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (quoting *Reeves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).  FFP must adequately allege that each Defendant "ma[d]e decisions on behalf of the enterprise or . . . knowingly carr[ied] them out."  *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).  The Amended Complaint does just that, noting each Defendant's role in the association-in-fact conspiracy (¶¶ 35, 37, 39–55).

### "Pattern"

The Amended Complaint adequately alleges fraud, predicate acts, a RICO enterprise, and the participation of each Defendant in that RICO enterprise.  The key inquiry is whether FFP alleges a pattern of predicate acts.

RICO requires proof that an "enterprise" committed two predicate acts within the span of a decade to make out a "pattern of racketeering activity."  *See* 18 U.S.C. § 1961(5).  Because Congress adopted RICO to target "long-term criminal conduct," *Moon v. Harrison Piping Supply*, 465 F.3d 719, 725–26 (6th Cir. 2006) (quotation marks omitted), the case law draws the pattern requirement tighter than the statute's twice-in-a-decade threshold.  FFP must further plausibly allege "that the racketeering predicates are *related*, *and* that they amount to or pose a threat of *continued criminal*

*activity.*"  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (first and third emphases added).

*See also Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 154 (1987) (noting that "the heart of any RICO complaint is the allegation of a *pattern* of racketeering ") (emphasis in original).  "[T]o state the inquiry simply," the Sixth Circuit has explained:

> a pattern is the sum of various factors including: the length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); the number of victims (the more the better); and the number of perpetrators (the less the better).

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995) (internal citation omitted).

Predicate acts are "related" if they exhibit the "same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events."  *Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir. 1994) (quotation marks omitted).  The Amended Complaint alleges related predicate acts: all instances of mail fraud were directed against the same victim (FFP), involved the same parties (Hume Supply as middle man), and used the same methods (Hume's "PER AGREEMENT" invoices, payments of which were then shuttled to Lewie Moeller) to obtain the same results.

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.  Lewie Moeller argues the Amended Complaint's predicate act allegations are not sufficiently continuous to plausibly allege the shadow consultancy engaged in a pattern of predicate acts (Doc. 29-1 at 13–15).  Lewie Moeller reads the Amended Complaint to allege a close-ended pattern of five predicate acts, from March 31, 2010 to May 31, 2011, a length

of time the Sixth Circuit previously has found insufficient to establish close-ended continuity.  *See Vemco*, 23 F.3d at 134.

FFP counters in two ways.  First, FFP claims Lewie Moeller undercounts by half the duration of the close-ended period, explaining that the shadow consultancy was established "on or about January 2010," and did not end until twenty-seven months later, when "Hume Supply received all of its payments on the Terrell, Texas project" (Doc. 33 at 17).  Second, FFP argues the Amended Complaint also can be read to allege an open-ended period because "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future" (Doc. 33 at 18).  Upon close examination, the Amended Complaint plausibly alleged neither a close- or open-ended pattern of predicate acts.

### Close-ended Predicate Pattern

To plausibly allege a close-ended "pattern," it is not enough for FFP to allege a "scheme to defraud" that lasted (by FFP's count) twenty-seven months.  Rather, FFP must allege a "pattern of *predicate acts*," 18 U.S.C § 1962(c) (emphasis added), which are discrete violations of federal or state law, 18 U.S.C. § 1961(1).  *See also United States v. Weatherspoon*, 581 F.2d 595, 601–02 (7th Cir. 1978) ("A scheme to defraud is not an act indictable under the mail fraud statute, for though the offense of mail fraud has its genesis in the scheme to defraud, the very gist of []the crime [] is the use of the mails in executing the scheme.") (quotation marks and brackets omitted).  If this Court must disregard, for purposes of close-ended continuity, conduct that does not constitute a predicate act, it also must disregard periods of time that fall before or after the five predicate acts alleged in the Amended Complaint.  *See Vemco*, 23 F.3d at 134 (holding "[t]he district court correctly concluded . . . that not all of the events alleged by Vemco qualify as predicate acts under RICO" because that conduct (issuing billing notices, threatening litigation, and resisting discovery) was not indictable

under any of the statutes listed in Section 1961(1) or was "too unrelated and distinct to be part of a pattern along with the earlier predicate acts").

FFP's attempt to tack on to the end of the predicate-act period the drawn-out payment process related to the Terrell, Texas project is particularly problematic.  FFP and Hume Supply did not settle accounts on that project until (apparently) April 2012, or twenty-seven months from when the scheme to defraud was formed -- at least so says FFP (Doc. 33 at 17).  Problem is, the Amended Complaint contains no allegations, factual or otherwise, about Hume Supply's interactions with FPP at any time after June 18, 2011, when Hume Supply submitted the last invoice to FFP.  Work on the Terrell, Texas project halted earlier, on February 11, 2011.  The Amended Complaint recites that, at some unspecified time, Hume Supply and Stedke sent FFP invoices "under the 'contract' and for 'added expenses,'" that FFP "objected to these invoices," and that shadow consultant Lewie Moeller "facilitated Hume Supply and Stedke in getting all of the invoices paid by FFP" (Doc. 22 at ¶¶ 68–70).  But that is all the Amended Complaint recites, so far as these invoices are concerned.[2]

To the extent FFP hopes to cast the Terrell, Texas invoices as fraudulent, it must describe those invoices consistent with Federal Civil Rule 9(b).  And to the extent FFP hopes to cast the submission of these invoices as predicate acts, it must at least identify the federal or state criminal statute the submitted invoices violate.  FFP does neither, even though it was the recipient and payor

---

[2]

Moreover, the Amended Complaint itself partially contradicts FFP's assertion that Terrell, Texas invoices were paid out in April 2012.  The Amended Complaint alleges that "approvals for payment [were] given by Chuck Moeller," and that Lewie Moeller "in his role at that time as Hume[] Supply's 'shadow consultant' within FFP facilitated" Hume Supply being paid (Doc. 22 at ¶¶ 70, 74).  In other words, the invoices were approved by CEO Chuck Moeller, while Lewie Moeller was still a shadow consultant.  But Lewie Moeller emerged from the shadows on January 1, 2012, when (for a time) the family appointed him "President and Chief Executive Officer of ODP and its subsidiaries, including FFP" (*id.* at ¶ 5).  As pled, the Amended Complaint therefore suggests the Terrell, Texas invoices were paid out *before* January 2012, when Lewie Moeller was still a shadow consultant.

15

of the invoices, and presumably could allege, with requisite particularity, that Hume Supply and Stedke's mailings or transmissions were further instances of mail or wire fraud.

Read in context of an Amended Complaint that is not otherwise reluctant to level charges of fraud and criminal conspiracy, the Terrell, Texas allegations read exactly like the Count with which they are most directly associated: as a breach of contract (¶¶ 104–08) .  FFP recites that Hume Supply and Stedke charged it "$462.50 a week for apartments that Stedke had leased for his employees but were going unused" (¶ 69).  But FFP does not allege that, in fact, no apartments had been leased.  The single reference to Lewie Moeller's knowledge that the project invoices were "false" (¶ 70) makes no attempt to explain why or how the invoices were false.  These and related allegations merely support the plausible inference that, because of Hume Supply's earlier breach of the contract, FFP believes it was not obliged to cover the costs of the unused apartments.  *See Twombly*, 550 U.S. at 570 (explaining complaint allegations must "nudge[ a plaintiff's] . . . claims across the line from conceivable to plausible").

The Amended Complaint's close-ended, predicate-pattern allegations -- five instances of mail fraud -- span thirteen months, from March 2010 until June 2011.  Measured in that way, this Court sees no significant difference between FFP's RICO claim and the 17-month, close-ended predicate "pattern" examined in *Vemco*.  There, defendant Flakt, acting through three of its officers, purposefully lowballed a contract bid to build a paint finishing system for plaintiff Vemco's new plant.  23 F.3d at 131.  Flakt committed three acts of mail fraud in (1) negotiating the contract, (2) making misrepresentations to lenders, and (3) reporting on job status, plus one act of extortion when it demanded certain payments from Vemco.  The Sixth Circuit found insufficient a supposed "pattern" of four predicate acts, spanning seventeen months, to allege Flakt's officers engaged in a "closed period of repeated conduct extending over a substantial period of time."  *Id.* at 134–35.

16

So too here.  Close-ended pattern analysis is, of course, a fact-specific inquiry.  But the Amended Complaint presents not just a series of predicate acts that is of relatively short duration. The Amended Complaint presents a purported pattern with a single victim; suffering the same type of injury with each predicate act; relatively few enterprise participants; and only one species of predicate act.  (FFP also identifies wire fraud as a predicate act (Doc. 22 at ¶ 81), but does not allege with particularity Defendants' use of the wires in furtherance of the scheme.)  FFP's sole citation to a case finding a "pattern" of predicate acts over a similar time span is distinguishable; the RICO pattern in that case contained additional complexities, relevant under *Tatum*, that are lacking here.  *See Swistock v. Jones*, 884 F.2d 755 (3d Cir. 1989) (sufficient allegations of predicate pattern presented by fourteen predicate acts and "numerous other misrepresentations" committed over fourteen months).[3]

The weight of circuit authority shows that patterns of the duration and complexity alleged here rarely satisfy Section 1961(5) on a close-ended basis.  *See, e.g.*, *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006) (requiring predicate acts that span, at minimum, one year); *First Capital Asset Mngt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (noting "this Court has never found a close-ended pattern where the predicate acts spanned fewer than two years"); *Hughes v. Consol-Pennsylvania Coal. Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (observing that "duration is the *sine qua non* of continuity in a close-ended scheme" and adopting a one-year duration threshold in such cases) (quotation marks omitted); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989)

---

[3] FFP also cites to *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1422 (3d Cir. 1991), as another example of a court finding a pattern of comparable duration sufficient to state a RICO claim on a close-ended basis (Doc. 33 at 17).  FFP misreads *Kehr*, citing to then-Judge Alito who found, in dissent, a nineteen-month pattern sufficient to state Section 1962(c) and 1962(d) claims. *Id.* at 1422–23. The panel majority however disagreed. *Id.* at 1419 (affirming dismissal of all RICO claims, in part for failure to allege a RICO pattern).

17

(explaining that "[i]f the pattern requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud from being transformed into a federal RICO claim" and deeming insufficiently continuous conduct that spanned one year).  *Cf. Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1526–28 (9th Cir. 1995) (rejecting a bright-line, one-year minimum threshold and finding a RICO pattern comprised of eleven predicate acts violating five federal or state statutes, affecting six firms, and spanning a thirteen month period).  Since the decision in *H.J. Inc.*, the Sixth Circuit has found a close-ended RICO pattern present only when predicate acts span a much longer period than alleged here.  *See, e.g.*, *Ouwinga*, 694 F.3d at 794–796 (five years); *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 801–03 (6th Cir. 2012) (seven years); *Brown*, 546 F.3d at 355 (three years), *overruled on other grounds by Jackson*, 731 F.3d at 566; *Fowler*, 535 F.3d at 411, 419–20 (criminal prosecution of member of outlaw motorcycle gang, "a long-term association that existed for criminal purposes," following six-year FBI investigation); *Columbia Nat. Res.*, 58 F.3d at 1110–11 (nine years); *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 886–87 (6th Cir. 1990) (seventeen years).

### *Open-ended Predicate Pattern*

FFP also casts the Amended Complaint as alleging an "open-ended" predicate pattern.  "It is th[e] threat of *ongoing* fraud[, undiscovered even after payment of the last Terrell, Texas invoice,] that transforms ordinary acts of mail and wire fraud into a continuous pattern of racketeering for purposes of the RICO statute . . ." (Doc. 33 at 18) (emphasis added).

An open-ended continuity inquiry "turns on whether the plaintiff has pleaded facts suggesting the threat of continued racketeering activities projecting into the future." *Moon*, 465 F.3d at 726.  FFP can do so by alleging facts that show "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future." *H.J. Inc.*, 492 U.S. at 242.  It may also allege

18

plausible facts that establish "the predicates are a regular way of conducting [a] defendant's ongoing legitimate business." *Id*. at 243. "Subsequent events are irrelevant to the continuity determination, however, because in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred." *Heinrich*, 668 F.3d at 410 (quotation marks omitted). "[T]he threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate acts may, and indeed should, be considered. In sum, the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity." *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).

The totality of the facts alleged in the Amended Complaint establish that the scheme to defraud FFP does not pose a threat of continuing criminality. For one, Defendants' "inside man," Chuck Moeller, is now deceased -- no party can seriously dispute that fact. FFP sued Chuck Moeller's estate in 2013 (Doc. 23 at 2 & n.1). The Amended Complaint alleges that Chuck Moeller was integral to the scheme's success. More to the point, as pled, the scheme apparently sputtered out on its own. "In late 2013 (per a court order) counsel for Hume Supply finally made available documentation showing wrongful activity identified in this action" (Doc. 22 at ¶ 24). Granted leave to amend its original Complaint in June 2014 (Doc. 19), FFP presents no allegations of predicate acts after June 2011, even though it had obtained discovery in related litigation on the scheme; knew of the scheme; and presumably could have scoured its files to identify other questionable Hume Supply invoices submit to mail fraud.

This is not a case in which "a RICO action [was] . . . brought before continuity c[ould] be established." *H.J. Inc.*, 492 U.S. at 242. Nor is this a case in which FFP alleges predicate acts continued after filing of the complaint. *See MacKenzie v. Murphy*, 1999 U.S. App. LEXIS 2289, at

\*\* 13–14 (6th Cir.).  Nor, even, was there "a fortuitous interruption of [the alleged RICO predicate acts] such as by an arrest, indictment[,] guilty verdict[,]" or other events revealing to FFP the true nature of the shadow consultancy.  *Busacca*, 936 F.2d at 238.  Rather, the last predicate act occurred nearly three years before filing of the original Complaint in late March 2014.  The scheme laid undiscovered for more than two years.  Theoretically, "there was nothing to stop [Defendants] from continuing to misappropriate monies" after June 2011, *id.*, but the Amended Complaint contains not even a hint that they did.  *See Kehr Packages, Inc.*, 926 F.2d at 1417 ("[W]e do not place much emphasis on the fact that mailings might have continued for years" in the absence of particular allegations that these continued mailings were anything but "innocent mailings").  It does not make linguistic sense to conclude the shadow consultancy, which could be successful only if concealed from FFP, poses a "continuing threat of criminal activity."

Because FFP fails to plausibly allege an essential element of its Section 1962(c) claim, that claim is dismissed without prejudice.  Further, FFP's Section 1962(d) claim must be dismissed because "[a]ny claim under [S]ection 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."  *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993).  Having dismissed the only claim over which this Court has subject-matter jurisdiction, this Court declines to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).

### Cross-Motions for Sanctions

An order for sanctions lies within this Court's sound discretion.  *See* Federal Civil Rule 11(c)(1).  This Court declines to exercise that discretion, especially at this very early stage of the case.  Counsel are reminded to follow the American College of Trial Lawyers Code of Pretrial and Trial Conduct.  Counsel might also take to heart the instruction from *The Taming of the Shrew* to "do as

20

adversaries do in law, strive mightily, but eat and drink as friends."

**CONCLUSION**

Defendants' Motions to Dismiss (Docs. 29 & 30) are granted, and the Amended Complaint is dismissed without prejudice.  The Cross-Motions for Sanctions (Docs. 31 & 34) are denied.

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

August 29, 2014
